PHIL A. ANANIA, APPELLANT AND CROSS-APPELLEE, V.
LINDA M. ANANIA, APPELLEE AND CROSS-APPELLANT.
576 N.W. 2d 830

Filed March 3, 1998.   No. A-96-894.

Steven J. Lefler, of Lefler & Franklin Law Office, for appellant.

James T. Boler, of Moore, Boler & McDermott, P.C., for appellee.

HANNON, MUES, and INBODY, Judges.

HANNON, Judge.

Phil A. Anania and Linda M. Anania lived in a meretricious relationship for many years after their marriage was dissolved and, while doing so, bought a home in which they and their children lived. After the children went away to college, Phil brought this action seeking to have the court compel Linda to vacate the home and to quitclaim any interest she might have in that home to him. Linda counterclaimed, praying for an order determining her interest in the home and requiring Phil to pay her the value of that interest. The trial court determined that the value of Linda's interest was $21,036.66 and that she should have a lien in that amount, plus interest. The court ordered that if Phil did not satisfy Linda's lien in full by a certain date, the property was to be listed and sold.

Phil appealed, alleging that the trial court erred in finding that Linda had an interest in the home, in determining the fair market value of the home, and in failing to give him credit for the downpayment he made. We conclude that the parties were incorrect in trying the case as a marriage dissolution action, that the case must be tried on the basis of real estate law, and that, after a de novo review, the trial court did not abuse its discretion. We therefore affirm. However, we do modify that part of the order which requires the home to be listed and sold if Phil does not satisfy Linda's lien to provide that Linda shall have a judgment lien in the amount of $21,036.66, plus interest, which may be enforced as a judgment as provided by law.

## PLEADINGS

In his petition, Phil alleged that after the parties had been divorced, they continued to live together to provide a "stable family home for the minor children"; that he purchased a home in which the parties and the children lived; that both parties purchased furniture, household goods, and vehicles; and that both parties incurred debts. He further alleged that the children had become emancipated and that he desired to become physically separated from Linda, to remain in the home which he purchased, to have Linda removed from the home, to have Linda be

held responsible for her own debts, and to have Linda sign a quitclaim deed transferring her interest in the property to him. He additionally alleged that Linda had taken "certain personal items," which he desired to be returned to him. However, Phil did not describe or identify those items.

Phil prayed for an order compelling Linda to vacate the home, to sign a quitclaim deed transferring her interest in the property to him, and to take her physical possessions with her when she vacated the home. He also prayed for an order requiring both parties to be responsible for their own debts and for "temporary and restraining orders preventing [Linda] from transferring, encumbering, hypothecating, concealing, destroying or otherwise disposing of any real and personal property."

In her answer, Linda admitted that they had formerly been married but otherwise denied the allegations. Linda also filed a counterclaim alleging that the parties had divorced on August 3, 1983; that they continued to reside in their home until June 8, 1990, when they sold it; that on June 19, 1990, they acquired the home now in dispute; that pursuant to an "agreement" between them, the new home was to "take the place of the prior family residence"; that she paid for improvements and repairs to the home; and that she supplied a substantial number of hours of labor painting and refurbishing the home. She also alleged that since June 1990, pursuant to the parties' agreement, she has paid for food, furnishings, the majority of the costs of tuition and clothing for their children, and all other family expenses other than mortgage payments and utilities. Linda prayed for an order determining the value of the home and "other assets of the parties," determining each party's interest in the property, and requiring Phil to pay her the value of her interest in such property. Phil generally denied each of Linda's allegations.

## SUMMARY OF RELEVANT EVIDENCE

The parties married in 1975 and divorced in 1983. In the divorce decree, Linda was awarded physical possession of the parties' twin children, date of birth February 29, 1976, and Phil was ordered to pay child support. After the divorce, the parties continued to live together as though married. In 1984, the court modified the decree by awarding the parties joint custody,

with possession in Linda. The modification order also provided that child support payments were to stop and that the parties were "jointly responsible for all of the financial needs" of the children.

The record reveals that both parties had separate jobs and incomes. They kept their money, automobiles, and all property separate, except for the home and perhaps its furnishings. They do not agree on what expenses each of them had agreed to pay or, in fact, did pay toward the support of the children and the household. Phil testified that they agreed that she would buy the family's groceries and other incidentals and that he would make all other major payments, including house mortgage payments, utilities, and "most of the large cash purchases." Phil stated that they had agreed that she would buy anything under $75 and that he would buy anything over $100. Linda testified that although Phil paid the house payments and utilities, she paid for other home improvements, maintenance, expenses for the children, clothing, and food. There is no testimony establishing that either party ever demanded reimbursement for any expenses he or she paid. However, the record does establish that the parties gave each other gifts and maintained the appearance of still being married before their children, family, friends, and business associates.

After the divorce, the parties continued to live in the marital home until 1990, when they sold it and equally divided the equity of approximately $15,000. The parties then bought and moved into the home which is the subject of this action. It is clear that both parties regarded the new home as a desirable improvement in the family's living arrangement. The parties agreed on its purchase, and the home was conveyed to them as joint tenants with rights of survivorship. The evidence does not establish the cost of the new home with the clarity that such facts are usually established; however, it was, according to Phil, approximately $149,300. Phil paid the $46,175.22 needed as a downpayment and for closing costs. The balance of the purchase price was financed by a mortgage on the home, which both of them signed. The evidence does not show the amount of that mortgage, but it would necessarily have been approxi-

mately $103,000. Phil also paid all of the monthly mortgage payments and the insurance premiums on the home.

Phil testified that when they were

> in front of a realtor signing agreements [to purchase the home] I said to [Linda] I would really like to enter the same type of agreement that Rose and I and Tom and I had. And, in fact, the fact I'm putting down $50,000 now for this, and for any reason we try to sell this place, I'd like my $50,000 back. And if there's any equities left, then we'll split it. And she said, fine. It wouldn't be any problem.

On the other hand, Linda testified that she and Phil never discussed what would happen upon the sale of the property.

Linda testified that the home was an older one which they recognized needed refurbishing and decorating to their tastes and that she agreed to supply the money or labor to do so. Linda's evidence shows that shortly after the home was purchased, she spent $2,955.20 for floor refinishing, approximately $1,290 for floor coverings, $1,650 for exterior painting, $1,954 for window coverings and blinds, $675.99 for landscaping, and $6,848 for the installation of an outdoor spa. She testified that she did a great deal of the work, such as painting, removal of wallpaper, and landscaping herself.

Phil testified that he also generally improved the real estate and made major repairs, but he did not identify such improvements or repairs. In July 1991, Phil added on to the house, which increased the size of the living room. This addition cost $10,860, and he paid for it by placing a second mortgage on the home. The evidence shows that on August 7, 1991, the parties borrowed $13,170.52 at 12.29-percent interest, which was payable in 96 installments of $215.50, commencing on September 2, 1991, to finance this addition. Phil further testified that approximately 3 years before trial, he refinanced the mortgage to pay for the addition and to obtain a more favorable interest rate on the mortgages. He testified that he alone signed the 1993 mortgage, but the record shows neither the amount nor the terms of the mortgage. The evidence does, however, establish that as of February 29, 1996, the unpaid principal of the mortgage was $117,389.44, and the accrued interest was $1,407.23. Including a facsimile fee of $20, the unpaid balance was

$118,816.67, which was accruing interest at an annual rate of 7.5 percent.

In August 1994, the parties' twins left home for college. The following January, Phil's attorney mailed Linda a letter requesting that she leave the home. Phil filed this action on January 27, 1995, and Linda left the home in April 1995.

At trial, Phil opined that the home's market value was $149,000. He agreed that he was asking the court to "affirm the original agreement," that is, after he gets his $46,000 downpayment back, they split any equity "50/50." However, he maintained that after the $46,175.22 and the $118,816.67 mortgage were deducted from the fair market value, there was no remaining equity in the property. Phil further maintained that he should be credited for the possessions that Linda took from inside the home if the court found that Linda had some equity in the property. Linda opined that the home was worth $185,000. Daniel L. Wilder, a professional real estate appraiser, appraised the home at $163,000, and Patrick Morrissey, also a professional real estate appraiser, appraised it at $175,000.

Both parties also introduced summaries of the expenditures they claimed to have made to support the household and the children since 1990, as well as before. Under the pleadings, such evidence is of doubtful relevance, and under the law as we understand it, and as set forth below, such evidence is clearly irrelevant. Therefore, we shall not summarize the voluminous and detailed expenditures each party claims to have made to support the household, to maintain the home, and to support each other and their children. Additionally, Phil introduced evidence of his property which he claims Linda either converted or damaged. Such claims would sound in tort for conversion. Under the pleadings, this evidence is also irrelevant, and therefore, it too is not summarized.

## TRIAL COURT'S DECISION

After a long trial, the trial court made numerous specific findings about the history of the parties' relationship. The court found that the home "was titled jointly" and was worth $173,000. Apparently, to dispose of the voluminous evidence which we referred to above and did not summarize, the court

found that the parties had "operated as general partners of a partnership in the operation of the family type residence. All of the contributions made by each, whether in cash or in kind, were treated by the partners, as equal inputs, and they are equal share owners."

The court also found the following values:

| | |
|---|---:|
| Value of home | $173,000.00 |
| Mortgage payout | 118,816.67 |
| Net value | $ 54,183.33 |
| Assumed 7 percent sales commission | 12,110.00 |
| Net value to parties | $ 42,073.33 |

The court, recognizing that Phil wanted the house and that Linda did not, ordered that (1) Phil be declared the sole owner of the property; (2) Phil's ownership was subject to Linda's lien of $21,036.66, accruing interest at 8.5 percent per annum as of April 1, 1995; (3) Phil shall satisfy Linda's lien in full on or before April 1, 1997; and (4) if Phil fails to pay Linda's lien in full by April 1, 1997, the property shall be listed and sold, with the proceeds being used to satisfy Linda's lien.

## ASSIGNMENTS OF ERROR

Phil alleges the trial court erred in (1) determining the value of the real estate, (2) failing to give him credit for the downpayment on the real estate, (3) determining that the parties were equal shareholders in the real estate, and (4) awarding Linda a lien of $21,036.66. Linda cross-appealed, but the only error she assigned was the trial court's failure to award her attorney fees.

## STANDARD OF REVIEW

In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Bauermeister v. McReynolds*, 253 Neb. 554, 571 N.W.2d 79 (1997).

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Fales v. Books*, 253 Neb. 491, 570 N.W.2d 841 (1997).

## ANALYSIS

█ We disagree with the trial court's determination that the parties' arrangement was a partnership. As defined by statute, a partnership "is an association of persons organized as a separate entity to carry on a business for profit . . . ." Neb. Rev. Stat. § 67-306(1) (Reissue 1996). That clearly is not the case here.

The parties' evidence and arguments demonstrate that they base their respective positions on marriage dissolution principles. In his brief, Phil recognizes that dissolution of marriage cases are not directly on point. However, such cases are the only ones he cites in support of his position. The cases cited by Linda in support of the trial court's decision are also dissolution of marriage cases.

It is self-evident that no judge can study a history of a family's household expenses and its activities and subsequently determine which party got the best of the arrangement and which party is therefore indebted to the other and to what extent. Even a divorce court does not pretend to engage in such an exercise.

█ In the instant case, the parties' payments were made either pursuant to their individual understandings of their "agreement" or as voluntary contributions to the household. Payments made pursuant to the agreement merely satisfied the agreement, and thus reimbursement by way of a greater claim to the house cannot now be sought. Moreover, voluntary payments for the benefit of another without a request cannot be recovered at law or ordinarily in equity, subject to the exceptions of mistake of law, coercion, or subsequent ratification by the party benefitted. 42 C.J.S. *Implied Contracts* § 8 (1991). Both parties attempted to build a case by showing that they had contributed more to the living arrangement than the other and arguing that they should therefore be given a greater interest in the real estate in which they both held title. Except for some general principles gleaned from marriage dissolution case law, neither party produced any authority to support such a theory.

█ Our analysis of this case must begin with a recognition that the parties were not married. However, that does not necessarily bar either party's claims. The rule is as follows:

"[T]he fact of a meretricious relationship does not bar claims to the property acquired during the period of such

relationship, where the claim is based on general principles of law without respect to a marital status; the fact that the parties have engaged in an illicit relationship does not bar either party from asserting against the other such property claims as would be otherwise enforceable."
*Abramson v. Abramson*, 161 Neb. 782, 792, 74 N.W.2d 919, 927 (1956). See, also, *Ropken v. Ropken*, 169 Neb. 352, 99 N.W.2d 480 (1959). We now analyze the record under general principles of property law.

### Failure to Give Credit for Downpayment.

Before addressing Phil's argument, it is necessary to determine ownership of the home. The home was conveyed to the parties as joint tenants with rights of survivorship. The deed in no way indicated the property was deeded to the parties other than equally. Joint tenants are seized of the whole estate and have an undivided share of the whole estate. *Jindra v. Clayton*, 247 Neb. 597, 529 N.W.2d 523 (1995). The shares of interests of joint tenants are presumed equal. *Id.* There is no evidence to rebut the presumption that Phil intended that the property be other than in joint tenancy with rights of survivorship, because Phil testified that he had it so conveyed so that Linda and the twins would have a home if he died. Phil's testimony that Linda had agreed to reimburse him for the downpayment he supplied upon sale clearly establishes that Phil and Linda had equal interests in the home. That is not to say that Phil's claim is invalid or ineffective but only that his testimony established that the property was owned as joint tenants. Furthermore, at trial, Phil testified that after he recovered his downpayment, the equity should be split equally. Clearly, the parties owned the property as joint tenants.

If Phil's version of the facts are accepted, then when the parties bought the home, Linda agreed that when they sold the home, Phil would receive the $46,175.22 that he supplied for the downpayment and that the balance of their equity would be split equally. This agreement, if made, would not have given Phil a greater than 50-percent interest in the home, but, rather, it would have given him a promise that when the home was sold, he would get his downpayment back. The house has yet to

be sold, so he would not be entitled to his money back. Linda denies that any such agreement was made. The trial court did not make a specific finding on this factual dispute, but a finding that the agreement did not exist probably inheres in its general finding that the parties' contributions were equal.

We observe that Phil's petition conflicts with his testimony that the parties purchased the home with his money under an agreement that he would be repaid when the house was sold. In his petition, Phil sought complete ownership of the home and did not seek to have the agreement enforced. In addition, immediately after the home was purchased, Linda spent several thousand dollars and a great deal of personal effort improving the home. If Phil had extracted a promise from Linda to recover his investment in the home, one would expect Linda to have demanded the same protection for her investment, especially when the evidence shows that the parties expected Linda to commence the improvements immediately after the purchase of the home. Upon both the findings made by the trial court and our own findings, we determine that at the time the home was purchased, the parties did not agree that Phil would be reimbursed for the downpayment when the home was sold. We therefore conclude the trial court did not err in failing to give Phil credit for the downpayment.

### Determination That Parties Had Equal Share in Home.

Phil bases his argument that the trial court erred in determining that the parties were equal shareholders of the real estate upon the fact that (1) he made the downpayment, (2) he paid more of the household expenses than Linda, and (3) he contributed $22,519.08 for improvements, including between $10,860 and $13,170.52 for an addition. The first two have been rejected above. Except for the addition, the evidence of the improvements made by Phil is sketchy and not well supported. The addition was financed by a second mortgage, which upon refinancing found its way into the $118,000 mortgage balance that the trial court subtracted from the value of the home to arrive at the value of Linda's interest. In effect, Linda is therefore paying for one-half of the addition. The evidence additionally shows that Linda also made improvements on the property.

However, except for the spa, the only evidence on the improvements are their costs. Moreover, there is no evidence showing the amount by which any of the claimed improvements, other than the spa, enhanced the value of the home. The real estate appraisers did testify that the spa increased the value of the property by $500 or $1,000. But the court did not separately address this issue, and neither party argues error in connection therewith.

We realize that it is possible for cotenants of real estate to base claims against other cotenants of the same property upon theories other than those we have discussed. See, e.g., 48A C.J.S. *Joint Tenancy* § 25a (1981); *Giles v. Sheridan*, 179 Neb. 257, 137 N.W.2d 828 (1965). However, neither party pled facts which would justify additional relief under other principles of law, nor have they argued any such matters in this court. Instead, the parties chose to litigate the equities between them as though the court was dissolving their marriage. Accordingly, we have not considered possible claims under other theories.

*Determination of Value of Real Estate.*

The trial court determined the real estate to have a fair market value of $173,000, despite the fact that one expert appraiser opined its value to be $163,000 and another $175,000. Both experts were well qualified with excellent credentials. Phil argues the trial court should have split the difference. We are of the opinion that while the true value of property in litigation can be halfway between the values found by appraisers, all too frequently splitting the difference between values arrived at by experts represents an abandonment of responsibility by the fact finder. It is similar to a jury rendering a quotient verdict or a judge using a coin to determine a difficult fact question.

Phil also argues that the $175,000 value represents a value based on square footage which includes the addition he placed on the house. An excerpt from Phil's brief reads: "It is apparent that he is getting penalized two time[s]: (1) because of his dollars, he paid for an addition that increased the square footage which increased the equity; (2) he doesn't have returned to him his money which increased the square footage." Brief for appellant at 9. This argument is premised on a misunderstanding of

the record and the court's order. The record shows the additional cost of $10,860, which was financed by a second mortgage on the home and which was included in the new mortgage when the old mortgages were refinanced in 1993. The mortgage balance of $118,816.67 is more than sufficient to include the balance of the original mortgage and the $10,860 paid for the addition. These figures show that Linda effectively paid for one-half of the addition and that the addition was properly included when the home was valued.

In our de novo review of the facts, we observe that two well-qualified experts thoroughly investigated the facts bearing on the value of the home. They obtained information on sales of houses they thought to be comparable and other relevant information in the usual way. They disagreed on which comparables to use, how to handle them, and their significance. But the work of both appraisers was reasonable, and their opinions were well supported.

Triers of fact are not required to take opinions of experts as binding upon them. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996). The determination of the weight that should be given expert testimony is uniquely within the province of the fact finder. *Id.*

We are in the same position as the Nebraska Supreme Court was in the case of *Shald v. Shald*, 216 Neb. 897, 346 N.W.2d 406 (1984), where the parties' three appraisers differed on the value of certain real estate. The trial court used a figure between the high and the low figure. The Supreme Court, deferring to the trial court's discretion, could not say that the trial court had erred in the value it placed on the real estate. Neither can we do so in the case at hand.

*General Considerations.*

In his petition, Phil alleged only that he "purchased" the home and that he desired to become physically separated from Linda and to remain in the home. Apparently, on the strength of these allegations, Phil asked the court to require Linda to quitclaim the home to him. Neither the allegations in the petition nor the evidence could justify Phil's requested relief. On the other hand, Linda prayed for a determination of each party's

interest and for an order requiring Phil to pay her the value of her interest. The trial court essentially granted her requested relief. We are therefore concerned about whether or not the court had the authority to issue such an order. Specifically, we are concerned with whether or not a court can, in cases other than marital dissolution cases, order one coowner to pay another coowner for his/her share of the property without requiring a sale of the property.

The property was held in joint tenancy. Joint tenancy may be terminated or severed by any act which destroys one or more of its unities and may also be severed by the act of joint tenants in destroying unity of possession, as by partition. *Yunghans v. O'Toole*, 199 Neb. 317, 258 N.W.2d 810 (1977). One common owner of property may partition the property as provided by Neb. Rev. Stat. §§ 25-2170 through 25-21,111 (Reissue 1995), but that procedure contemplates that the real estate may be divided, if possible, or otherwise sold in a judicial sale. Neither party sought partition by sale or in kind. Instead, the parties and the trial court referred to this action as a quiet title action. Neb. Rev. Stat. § 25-21,112 (Reissue 1995), which provides for quiet title actions by persons claiming title against persons who claim or apparently have an adverse estate or interest, is of no relevance here.

Some guidance is, however, provided by *Lynch v. Lynch*, 18 Neb. 586, 26 N.W. 390 (1886), where the Nebraska Supreme Court affirmed an order in a partition action, attaching an interest of one coowner that was too small to be divided to the interest of another coowner and ordering the latter owner to pay cash for the determined value of the small interest. The court found that a division could not be made "without great prejudice" to the owner of the small interest and that because the owner of the other interest did not object to the attachment, the consideration for the property was "properly made a lien on the portion of the lot assigned to him." *Id.* at 592, 26 N.W. at 393.

In the case at hand, Linda received the relief that she sought, and Phil, with the exception that he was ordered to pay Linda the value of her interest, also received what he asked for, the house. While Phil does assign as errors the trial court's determinations that Linda had an interest and the value of her inter-

est, he does not specifically object to the manner in which the court ordered him to compensate Linda for her share of the house. It is clear that if the court was to find that Linda had an interest, Phil did not want the house sold in partition. Therefore, on the basis of the *Lynch* case and the fact that both parties have essentially consented to the procedure by which their respective interests in the home were to be split, we conclude that the trial court could properly require Phil to pay Linda's interest.

However, in addition, the court's order provided that if Phil did not pay the lien by April 1, 1997, the property would be listed and sold. We realize that this procedure is followed in some dissolution cases; however, we can find no statute or case law which authorizes a court to require real estate to be listed and sold as a means of enforcing a lien. We believe our statutes, Neb. Rev. Stat. ch. 25, art. 15 (Reissue 1995), provide the correct procedure for the enforcement of a lien against property, and in this case there is no reason why that procedure should not be followed. We therefore modify the order appealed from to provide that Linda shall have a judgment lien in the amount of $21,036.66, plus interest at 8.5 percent per annum from April 1, 1995, which lien may be enforced as a judgment lien against the real estate. If it is not paid within 60 days of the spreading of the mandate from this court, the lien may be executed as provided by law.

### Linda's Demand for Attorney Fees.

Linda argues that the trial court erred in not awarding her attorney fees. She bases this claim on the premise that this case is actually a continuation of the parties' 1983 dissolution action. This clearly is not a continuation of that case, and it is also clearly not a dissolution case. In *Abramson v. Abramson,* 161 Neb. 782, 74 N.W.2d 919 (1956), the petitioner sought a divorce on the basis that the parties were married by a common-law union in Iowa, but the Supreme Court found that they had not been married in Iowa and that therefore they were not married. In *Abramson,* one of the parties sought attorney fees, and the court stated the usual rule, that is, that it is the practice in this state to allow recovery of attorney fees only in such cases as are provided for by statute or where the uniform course of

procedure has been to allow recovery of fees. The court thus denied the application for fees.

This case started as a quiet title action and ended as a somewhat unusual partition action. While attorney fees are frequently allowed in partition actions under § 25-21,108, the attorney fee authorized by that statute is for the plaintiff's attorney and then only when the partition is amicable. We can find no uniform practice that would allow an award of attorney fees in this case. Linda is therefore not entitled to such fees. We conclude that the trial court's decision should be affirmed as modified.

AFFIRMED AS MODIFIED.