IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

ROBERT L. V. ROBIN L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ROBERT L., APPELLEE,

V.

ROBIN L., APPELLANT.

Filed December 1, 2015.    No. A-15-397.

Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed.

John A. Kinney and Jill M. Mason, of Kinney Law, P.C., L.L.O., for appellant.

Chris Pomerleau, of Cordell Law, L.L.P., for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Robin L. appeals from the decree of dissolution entered by the district court for Douglas County awarding sole legal and physical custody of the parties' five minor children to Robert L. Robin contends the court abused its discretion in awarding sole custody to Robert, and she also argues the court erred by failing to rule on the admissibility of the guardian ad litem's (GAL's) report. Because we conclude (1) the district court did not abuse its discretion in awarding sole legal and physical custody to Robert and (2) Robin has failed to establish any prejudice from the court's failure to rule on the admissibility of the GAL report, we affirm.

### BACKGROUND

Robin and Robert were married in June 1997 in Omaha, Nebraska. During the marriage, they adopted six children, one of whom was emancipated at the time of trial. The other five children included the oldest daughter, L.L., born in 1999; a son, C.L., born in 1999; a daughter, S.L., born in 2000; and the youngest two, both daughters, born in 2001 and 2002. According to

- 1 -

Dr. Glenda Cottam, a licensed clinical psychologist and attorney who performed a custody evaluation and psychological assessments of the family members, all of the children have special needs or "challenges" of some kind.

On January 16, 2014, Robert filed a complaint for dissolution of marriage seeking sole legal and physical custody of the minor children. Robin filed an answer and counterclaim, also seeking sole legal and physical custody. While the dissolution proceedings were pending, a temporary order granted the parties joint legal custody and alternated physical custody on a weekly basis. In the temporary order, the court ordered the parties to engage Dr. Cottam to perform a custody evaluation and also appointed Willow Head as the GAL. It further directed the parties to undergo psychological testing with Dr. Cottam, the results of which were to be made available to counsel for both parties and the GAL.

The matter proceeded to a bench trial on January 7, 2015. Because custody is the only issue on appeal, we summarize the testimony and evidence relevant to that issue only.

Robert testified he was seeking sole custody of the children and did not believe joint custody would be in the children's best interests. Part of the reason he was seeking sole custody was that he and Robin were unable to agree on childrearing decisions. Robert also had concerns about Robin's parenting. He believed that Robin's way of interacting with the children was harsh and that she escalated situations into bigger issues and arguments. He believed he was nurturing toward the children while Robin caused pain and disharmony among the children. He testified he was the person who woke the children up in the mornings, tucked them in at night, fed them, and helped them with homework. Robert did not believe the children should be split up, because of the "kind of community" and "mutual relationships" that existed among them.

Robert's mother, Geraldine L., testified she lived in Virginia and visited Robert's family at least three times per year. Based on her observations of Robert's parenting, she believed he was nurturing and was the parent who got the children up in the mornings and got them ready for school. She believed Robin engaged in "negative parenting," handling the children "as though they were always wrong." Geraldine said that whenever she and her husband said something positive about the children to Robin, Robin told them they were being manipulated.

Robert's sister, Cynthia L., testified she lived in Virginia and visited Robert's family at Thanksgiving, during the summer, and other times depending on her schedule. Based on her observations, Cynthia believed Robert cooked for the children and helped with homework more than Robin. She described Robin's discipline of the children as "very harsh, sometimes very physical." She described Robert's discipline as consisting of "a lot of discussion," helping the children "understand if something they did was incorrect and why." Cynthia believed Robin displayed a lack of respect for the children. She described a time when Robin pulled one of her daughters up the stairs by her hair because Robin did not believe the daughter had brushed her hair for church. Another example was when Robin "severely" punished one of the children after Cynthia told Robin the child had accidentally broken a glass while washing dishes in the porcelain kitchen sink. Cynthia said the anxiety rose in the house whenever Robin was home.

Robert rested, and Robin called Dr. Cottam, the licensed psychologist appointed by the court to perform a custody evaluation. Near the beginning of her testimony, the reports she completed following her psychological assessments of the parents and children were admitted into

evidence. The reports pertaining to Robert and Robin indicated that while L.L. may wish to reside with Robert due to her anger toward Robin, "the younger children could be appropriately parented by both Mr. and/or Ms. [L.] - as neither parent is 'unfit' in the legal or psychological definition of the term."

Dr. Cottam was examined regarding her assessments of L.L., C.L., and S.L., the three oldest of the minor children, as well as of Robert and Robin. On direct examination, she was not asked about her assessments of the youngest two girls.

Dr. Cottam testified that L.L. had become the "chief sibling" and "ringleader" after her older sister enrolled in college. L.L. worried about her younger siblings, some of whom had significant special needs, and helped look after them. However, L.L. had her own challenges, including significant mental health problems in the form of depression and anxiety, and she had been hospitalized for psychiatric reasons three times. L.L. was "closely aligned" with her father and had "major issues" with her mother. According to Dr. Cottam, L.L. was at risk for "co-dependency behaviors," including having "boundary violations" with others and becoming "enmeshed in following someone . . . instead of making her own decision." Dr. Cottam indicated L.L. might be "enmeshed" with her father, whom she idolized.

Dr. Cottam testified C.L. had a good relationship with both of his parents, whom he described as "nice." C.L. had "lots of challenges," however, and needed structure and a predictable routine. Dr. Cottam's report indicated C.L. suffered from anxiety and had been diagnosed with attention deficit disorder and an autism spectrum disorder.

Dr. Cottam described S.L. as polite, cooperative, and probably the highest functioning of the children. S.L. was not "too far behind" in school and did not have any "Axis I mental health diagnoses." According to Dr. Cottam, S.L. described both of her parents as loving.

Addressing Robert and Robin, Dr. Cottam testified both were fit parents and gave "adequate, good" responses to her questions. One significant difference in their parenting was that Robert was "more relaxed," while Robin was "more tense, more structured." Dr. Cottam believed both parents had personality traits that "interfered with co-parenting." She explained that Robert's "narcissism score" was elevated, which was characteristic of people who "perceive themselves as doing well and not having too many problems" and who view problems as "other people's faults." She also testified that during Robert's assessment, he expressed his belief that Robin should have no parenting time with the children, which gave her concern about his "insight into a [sic] sharing these children between two homes." Regarding Robin, Dr. Cottam explained that she had "some obsessive-compulsive features" and that she was "a little rigid." Dr. Cottam recommended that both parents pursue counseling related to the divorce and parenting their special needs children, and she noted that Robin had been attending therapy to try to be "a little less tense."

Dr. Cottam believed Robin might have done more of the "heavy lifting" with things like scheduling medical appointments for the children, but thought both parents were involved in childrearing. She had some concern about Robert's ability to follow through with the children's therapy needs because of interruptions in their therapy that Robert had caused in the past. She discussed an instance in which Robert unilaterally ended L.L.'s therapy with a therapist he did not like.

Dr. Cottam testified that in performing a custody evaluation, it was normal to rely on material and information provided by therapists and court-appointed GALs. Dr. Cottam identified exhibit 157 as the GAL report she reviewed. After Robin's counsel offered exhibit 157, Robert's counsel objected on grounds of hearsay and lack of foundation. The court stated it would "hold off on receipt" until it heard additional testimony as to how the report was being used. Robin's counsel indicated the report was being offered "as something reasonably relied on by experts in this field," but then stated he would "move on."

Dr. Cottam testified that based on her evaluation and assessments of the family, she believed Robert should be granted physical custody of L.L. because of her close relationship with her father and because he connected with her and "stresse[d] her less." However, she believed Robin should be granted physical custody of the other four minor children. She did not explain the basis for her opinion, although she referenced the structure the children would have during the school week living with Robin. She also recommended that the parents alternate having all of the children together on weekends from Thursday evening through Monday morning; that way, the children would be together 8 of 14 nights.

On cross-examination, Dr. Cottam testified she performed her evaluation and assessments of the family in February and March 2014, nearly a year prior to trial, and had not seen any of the family members since then. She acknowledged that things may have changed. She also testified to the children's responses to various questions about their parents. C.L. reported he was closer to his father, his father would be best to get things quieted down, and both parents took him to appointments. On a "parent report card," C.L. gave his father As and Bs and his mother one F and "[q]uite a few Ds." S.L. reported she would want to tell her father if she was in big trouble, because he "'doesn't get as mean as mom.'" She also would talk to her father to make herself feel better, and she believed her father would be the best at quieting her down and helping her with homework. S.L. gave her father "15 As and one F" and her mother "one A and 10 Fs." One of the younger girls testified her father was the best cook, best to keep her safe, and best to get things quieted down; her worst grades for her parents consisted of one C for her father and six Ds for her mother. The other younger girl's responses were similar.

Also on cross-examination, when asked if she saw "a difficulty" in splitting the children up given L.L.'s role as "ringleader" among the children, Dr. Cottam answered, "Yes and no." She explained that if L.L. spent most of her time with Robert, she would be less stressed. However, "If she's with the other children and she's stressed, that's going to impact every single one of those other children."

At the conclusion of Dr. Cottam's testimony, the court asked her where it would "leave us" if the court was not inclined to split up the children. Dr. Cottam responded, "In a mess." She explained that if L.L. were with her mother, it would cause L.L. to be more stressed, unhappy, and angry. If all of the children were with their father, however, their relationship with their mother would suffer, "because dad has been so negative towards mom, and [L.L.] and dad become kind of like a twosome in talking about the negativity towards mom."

Robin testified that when she and Robert adopted their first three children, she worked part time for a year so she could be at home with them. When the family moved to Omaha from Virginia in 2006, she took a year off from work to situate the family. When the children were infants and

toddlers, she gave them constant hugs and kisses and love. Regarding her more recent parenting, Robin admitted she tended to be "more of a structured disciplinarian and less of a friend to the children." She testified she was working with a therapist, Dr. Ann Potter, to find ways to enjoy the children and be less anxious. Robin believed Robert tried to be the children's friend and placed the children "above" her.

Robin further testified that prior to the divorce proceedings, she and L.L. had "issues" but also had a very good relationship. She believed Robert had interfered with her relationship with L.L. She described instances when Robert spent half an hour to an hour per night with L.L. in her room with the door closed. One night, she heard Robert whisper to L.L., "'Your mother's love is fake.'" Robin believed she had been painted as the bad guy to the children.

Robin agreed with Dr. Cottam's recommendation of awarding physical custody of L.L. to Robert. She explained that L.L. interfered with her relationship with the other children by belittling her in front of them, verbally abusing her, and constantly criticizing her. She thought the children's relationships with each other may be strengthened by living apart during the week as Dr. Cottam recommended. Robin testified she had handled the children well during her alternating weeks of physical custody during the pendency of the case.

Willow Head, the court-appointed GAL, testified that after her appointment, she spoke with Dr. Cottam and the children's therapists, met with the children and parents, and conducted a home visit during each parent's week with the children. She believed both parents were loving and nurturing and fit to have custody. During her home visit with each parent, although the "vibe" was "slightly different," the children listened to the parent who was present and seemed to be relaxed and "performing normal activities." The GAL agreed with Dr. Cottam's recommendation of awarding physical custody of L.L. to Robert and of the other four children to Robin, although she did not offer an explanation for her recommendation. On cross-examination, the GAL explained that, given the children's special needs, she relied more on the recommendations of the "doctors and therapists" than she might have in other cases.

The parties also stipulated to the admission of Dr. Ann Potter's deposition. In her deposition, Dr. Potter testified she was a licensed clinical psychologist and had an initial consultation with Robert and Robin for marital counseling in December 2013, but had continued individual therapy with Robin only. Her therapy with Robin had focused on dealing with the effects of finding out about Robert's alleged affair and on learning more effective parenting and relationship skills. According to Dr. Potter, Robin believed Robert had undermined her relationship with her children, and her therapy had focused primarily on how to create a positive family atmosphere and experience. Dr. Potter indicated that Robin had made significant progress in that area.

The court conducted in camera interviews of L.L., C.L., and S.L. All three children testified they wanted to live with their father. L.L. explained that her father was better at helping her "with stuff" and understood her better. C.L. explained that his father "shows us respect" and is helpful and kind. S.L. explained that "more fights go on" when her mother is around and that she does not have a good relationship with her mother; she got along better with her father. L.L. and S.L. both testified they did not want the siblings to be split up; L.L. said that "would be really bad." C.L. was not asked about splitting up the siblings.

At the conclusion of trial, the court indicated this was a case in which everyone was "in agreement" that joint legal or physical custody "would not work." The court then found it was in the children's best interests not to be split up. The court believed both parents were fit to handle their parenting responsibilities, but that given the "peculiar and special needs of these children," Robert should be granted sole legal and physical custody of the five minor children. The court indicated that Robert had a responsibility to "normalize" the children's relationship with their mother, which was something that had not been "undertaken in any fashion." The court granted Robin parenting time on alternating weekends from Thursday after school to Monday morning, plus alternating Tuesday evenings from after school until 8:30 p.m. A decree of dissolution memorializing the court's judgment, along with a parenting plan, was filed on February 19, 2015. Robin timely appeals.

## ASSIGNMENTS OF ERROR

Robin assigns that the district court erred by (1) awarding Robert sole legal and physical custody and (2) failing to rule on the admissibility of the GAL report.

## STANDARD OF REVIEW

An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

In all proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 566 N.W.2d 750 (1997). To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted or excluded. *Id*.

## ANALYSIS

*Award of Sole Legal and Physical Custody to Robert.*

Robin argues that the court's decision to award sole legal and physical custody to Robert was "clearly unsupported by the evidence presented at trial." Brief for appellant at 13-14. She contends the court "simply dismissed Dr. Cottam's testimony in favor of alternative considerations which were never expressly articulated." Brief for appellant at 15. She further argues that the court "ignored the un-rebutted evidence from the only trained professional to testify that the children would never have a normal relationship with Robin if custody was awarded to Robert." Brief for appellant at 14-15. She maintains that the custody arrangement suggested by Dr. Cottam and the GAL was in the children's best interests.

When deciding custody issues, the court's paramount concern is the children's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6)

(Cum. Supp. 2014), in pertinent part, requires a court, in determining custody, to consider the following factors relevant to the children's best interests:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; [and]

(c) The general health, welfare, and social behavior of the minor child.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Many of the factors relevant to the children's best interests could have supported awarding custody to either parent in this case. Although during trial there was passing reference to Robert's alleged extramarital affair, neither party emphasized that fact, and the evidence generally was that both parents were responsible and capable of providing for the children's physical and educational needs.

One area on which the evidence focused was L.L.'s strained relationship with her mother and close relationship with her father. Although Robin testified she had a good relationship with L.L. prior to the commencement of the dissolution proceedings, she did not dispute that it was in L.L.'s best interest to grant Robert custody of her. Thus, the custody alternatives before the district court were (1) separating the children by granting custody of the four youngest children to Robin or (2) keeping them together by granting custody of all of the children to Robert.

Robin's primary argument essentially is that in choosing between the two custody alternatives, the court ignored Dr. Cottam's recommendation that custody of the four youngest children should be awarded to Robin and instead reached a decision unsupported by the evidence. At the outset, we note that expert opinions are not binding on triers of fact; the determination of the weight to be given expert testimony is uniquely within the province of the fact finder. *Anania v. Anania*, 6 Neb. App. 572, 576 N.W.2d 830 (1998). Although the district court did not clearly articulate its reasons for not following Dr. Cottam's recommendation, this does not preclude us from conducting a de novo review of the evidence and determining whether the court abused its discretion.

In conducting our de novo review, it is clear there was evidence to support Dr. Cottam's custody recommendation as well as evidence to support the court's ultimate custody decision. Having reviewed the evidence in detail, however, we cannot say the court abused its discretion in awarding sole legal and physical custody of all five minor children to Robert.

As noted above, Dr. Cottam provided little insight as to the basis for her opinion that custody of the four youngest children should be awarded to Robin, although she did testify that if all of the children were with their father, their relationship with their mother would suffer, "because dad has been so negative towards mom, and [L.L.] and dad become kind of like a twosome in

talking about the negativity towards mom." However, in her psychological assessments of Robin and Robert, she indicated that the four younger children "could be appropriately parented" by Robert or Robin.

While the promotion and facilitation of a relationship with the noncustodial parent is a factor that may be considered in making a custody determination, it is not the only factor nor is it a completely determinative factor. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). Certainly, the court was aware of Dr. Cottam's concern about the impact of awarding custody to Robert on Robin's relationship with the children. In granting custody to Robert, the court acknowledged that Robert's efforts to encourage a relationship between the children and their mother had been inadequate or nonexistent, and it admonished Robert that he had a responsibility to "normalize" the children's relationship with her. We cannot say the court abused its discretion simply because it did not give this factor as much weight as Dr. Cottam did. We disagree with Robin that the court merely gave this factor "lip-service." Brief for appellant at 14.

Dr. Cottam also referenced the structure the children would have during the school week living with Robin. Dr. Cottam testified that C.L. in particular needed structure and a predictable routine. However, Dr. Cottam did not explain how or why Robin would be better able to provide such structure. Dr. Cottam testified that Robin might have done more of the "heavy lifting" with things like scheduling medical appointments for the children, but she thought both parents were involved in childrearing. Robert testified he was the person who woke the children up in the mornings, tucked them in at night, fed them, and helped them with homework; this evidence was corroborated by Geraldine and Cynthia and undisputed by Robin. Additionally, Dr. Cottam testified on cross-examination that several of the children told her that their father was best at getting things quieted down and helping with homework. Thus, we cannot say that the children's need for structure rendered the court's custody decision an abuse of discretion.

One significant consideration supporting the court's custody decision was the finding articulated by the court that it was in the children's best interests not to be separated. It is sound public policy to keep siblings together when a marriage is dissolved, although the ultimate test remains the best interests of the children. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). In this case, there was evidence that it was in the children's best interest to be kept together. During her in camera examination, S.L., who according to Dr. Cottam was the highest functioning of the children, testified she did not want the siblings to be split up. Similarly, L.L., the oldest of the minor children, testified that splitting the children up "would be really bad." The court's in camera examinations of the children occurred in December 2014, more recently than Dr. Cottam's assessments of the children, which occurred in February and March 2014. Even at the time Dr. Cottam performed her assessments, it was clear to her that L.L. had become the "chief sibling" and "ringleader" after her older sister enrolled in college, and that L.L. helped with the younger children's special needs. Robert also testified to the "kind of community" and "mutual relationships" that existed among the children, which led to his desire to keep the children together.

The only evidence of negative consequences flowing from keeping the children together was (1) the testimony from Robin and Dr. Cottam suggesting that L.L. influenced the other children's views of their mother and (2) the testimony from Dr. Cottam on cross-examination that if L.L. were stressed while she was with the other children, it would "impact every single one of

those other children." We have already addressed the issue of the potential impact on Robin's relationship with the children; again, the court was aware of this consideration and did not abuse its discretion by failing to treat it as a determinative factor. Regarding the concern that L.L.'s stress may impact the other children, this did not necessarily outweigh the benefits of keeping the children together. Notably, Dr. Cottam testified that L.L. was much less stressed when she was with her father, which would reduce any negative impact on the other children. Furthermore, there was also evidence that L.L. provided help and support to the younger children, which she would be better able to do while living with Robert, given the reduced stress she would experience in that setting.

Another significant consideration supporting the court's custody decision was the evidence of the children's relationship with Robert and their expressed preferences for living with him. Although not neutral witnesses, Robert, Geraldine, and Cynthia testified that Robert was nurturing toward the children and disciplined them in an understanding manner, while they characterized Robin's parenting and discipline as "harsh" and "negative." This testimony was supported by Dr. Cottam's description of Robin as "tense" and "rigid," as well as by Robin's own testimony that she tended to be "more of a structured disciplinarian and less of a friend to the children."

While we express no opinion on the parties' parenting styles, the differing styles were reflected in the children's views of their parents and their descriptions of their relationships with them. On cross-examination, Dr. Cottam testified to the children's responses to questioning about their parents, which strongly favored Robert. For example, C.L. reported being closer to his father; S.L. reported she preferred to tell her father if she were in big trouble, because he "'doesn't get as mean as mom'"; and one of the younger girls reported her father was best to keep her safe and to get things quieted down. The children's scores on the "parent report card" were also much more favorable to Robert than Robin.

A similar preference for Robert was reflected in the children's in camera testimony. During the in camera testimony, L.L., C.L., and S.L. all testified they wanted to live with their father, and even if not artfully expressed, their preferences were based on sound reasoning: L.L. explained that her father was better at helping her "with stuff" and understood her better; C.L. explained that his father "shows us respect" and is helpful and kind; and S.L. explained that "more fights go on" when her mother is around and that she does not have a good relationship with her mother. Of course, the children's expressed preferences are not controlling, but they are factors to be considered among the other relevant best interest factors. See § 43-2923(6).

As we have said, there were considerations for and against awarding custody of all of the children to Robert. However, based upon our de novo review of the evidence, we conclude that the district court did not abuse its discretion in awarding sole legal and physical custody of the five minor children to Robert. The evidence supporting the court's custody decision was significant, and contrary to Robin's argument, the court did not ignore Dr. Cottam's concerns in reaching its decision.

*Failure to Rule on Admissibility of GAL Report.*

Robin's second assignment of error is that the district court erred by failing to rule on the admissibility of the GAL report. She contends the court's failure to rule on the report's

admissibility "must be viewed as a de facto sustaining of Robert's objection." Brief for appellant at 18. She further argues that the failure to receive the GAL report was reversible error, because the report was admissible as the type of record reasonably relied on by experts in Dr. Cottam's field and Robin was prejudiced by the court's failure to receive it.

We conclude that this issue is not properly before us. In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court. *Watson v. Watson*, 272 Neb. 647, 724 N.W.2d 24 (2006). After Robert's counsel objected to the admission of the GAL report during Dr. Cottam's testimony, the district court indicated it would "hold off on receipt" of the report until it heard additional testimony as to how the report was being used. Robin's counsel indicated the report was being offered "as something reasonably relied on by experts in this field," but then stated he would "move on"; the court never ruled on the admissibility of the report. By failing to insist on a ruling, Robin waived the issue and cannot raise it on appeal. See *Toombs v. Driver Management*, 248 Neb. 1016, 540 N.W.2d 592 (1995) (holding that where the appellant did not insist upon a ruling on his motions to compel and to strike a deposition, the issues were not properly before the appellate court).

Even overlooking Robin's waiver of the issue, however, Robin does not articulate how she was prejudiced by the court's failure to receive the GAL's report, and we see no such prejudice.

Robin argues the report was admissible pursuant to Nebraska Rule of Evidence 703, which provides in pertinent part that if the facts or data upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field, the facts or data need not be admissible in evidence. Neb. Rev. Stat. § 27-703 (Reissue 2008). However, simply because an expert reasonably relies upon facts or data to form an opinion does not transform the facts or data into admissible evidence. See *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 593, 514 N.W.2d 319, 324 (1994) ("The mere fact that an expert relied on medical records, however, does not transform those records from inadmissible hearsay into admissible evidence.").

Thus, even if Dr. Cottam reasonably relied upon the GAL report in forming her expert opinions as to custody, the report was admissible pursuant to rule 703 only to provide the basis for Dr. Cottam's opinion, not for the truth of the matter asserted in the report. See *State v. Simants*, 248 Neb. 581, 537 N.W.2d 346 (1995) (holding that the court did not err in admitting exhibits into evidence where they were not offered for the truth of the matter asserted therein but to provide a basis for expert testimony pursuant to rule 703). Given that Dr. Cottam provided ample testimony as to the bases for her opinions--including testifying that she had conversations with the GAL--we see no prejudice to Robin resulting from the court's failure to admit the GAL report. See *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 718, 566 N.W.2d 750, 754 (1997) ("Testimony objected to which is substantially similar to evidence admitted without objection results in no prejudicial error.").

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Douglas County.

AFFIRMED.